## CENTURY INDEMNITY CO. et al. v. STRENGTH et al.

No. 23513. Opinion Filed Nov. 22, 1932.

Hal Crouch and Philip N. Landa, for petitioners.

Murrah & Bohanon, for respondents.

ANDREWS, J. This is an original proceeding in this court by the respondent before the State Industrial Commission to review an award made by that Commission in favor of the claimant therein. The claimant hereinafter will be referred to as the claimant, and the employer will be referred to as the petitioner.

The claimant, an iron worker in the employment of the petitioner, in July, 1931, was drilling holes in aluminum window frames on the "Ramsey Tower" in Oklahoma City when aluminum shavings flew into his eyes. After a hearing the State Industrial Commission found that he had sustained a 15 per cent. permanent partial loss of the use of his right eye and a 5 per cent. permanent partial loss of the use of his left eye, and made an award in his favor of 50 weeks at

162

## 162

$18 per week in addition to the compensation theretofore paid for temporary total disability. This proceeding is to review that award. It is herein contended that there was no evidence to sustain the finding of the State Industrial Commission.

The record shows that the claimant had been an iron worker for 15 or 16 years and had been engaged in work similar to that in which he was engaged at the time he contends that he was injured. On direct examination he was asked and answered:

"Q. Now, on this day—that is, the 17th of July—did you get shavings and dust from your drilling instrument there in both eyes or one eye? A. Well, I really got it in both eyes, but the left eye was the one that affected me most. If we knocked off every time we got a little thing in our eyes we would be off practically half the time."

On cross-examination he was asked and answered:

"A. Why, dust or something blowing around in the building. A person can walk down street and accidentally get a little dust in their eyes. Q. Well, if you would get dust in your eyes often enough to keep you from working half the time you would get it in pretty often, wouldn't you? A. Not a sufficient amount—no, sir. Q. I will ask it this way: If you quit every time you got something in your eyes so that you wouldn't be working but half the time, you would get it in pretty often, wouldn't you? A. Not necessarily—no. Q. You did get dust and shavings in your eyes before this, though, hadn't you? A. In my eyes? Q. Yes. A. All I got was little minor stuff in there. Q. Well, you got aluminum dust and shavings in prior to July 17th, 1931, didn't you? A. I don't know if I ever did before. Q. Then what do you mean by saying if you would quit work every time you got something in your eyes you would be working only half the time? A. No more than a person walking down street will get dust in their eyes. Q. You are not working when you are walking down street, are you? A. I say, dust or something might fly in your eyes. * * * Q. Had you ever been to an eye doctor before? A. No. Q. Never in 15 or 16 years? A. That is, for an examination. I went to them about like this man I went to up here. For minor treatments and stuff like that. Q. How often did you go to a doctor? A. I don't know. In 15 or 16 years it would be hard to tell. Q. You have gone quite a few times, haven't you? A. Not necessarily quite a few. Q. What was it you told Dr. Hicks you got in your eyes about six months before? A. I didn't tell Dr. Hicks I got anything in my eyes six months before. Q. These vitreous opacities in your eyes—when the doctor called that to your attention you told him you noticed that about six months

before this 17th of July? A. Those streaks? Yes, I told him about that. Q. Was that right? A. It was."

He attempted to explain away the effect of that statement, but his explanation was in conflict with the statement of Dr. Hicks, as follows:

"* * * As to the vitreous opacities in both eyes, he states that he noticed that for some time prior to the accident."

The award was based on the testimony of a doctor that the claimant had a loss of "visual efficiency," but not a loss of vision, the term "visual efficiency" being explained by him as a "* * * loss of continued use of the eyes. * * *" That doctor testified that that loss was not of sight, but that it was spoken of by authorities as "efficiency loss." He further testified that there was no scale by which the amount of loss could be estimated and that he only placed an estimate on the amount of the loss.

We quote from the record, as follows:

"By the Court: Doctor, if I understand, there is no loss of vision in his eyes, but merely loss of efficiency? By Witness: Yes, sir."

The record shows that there was no permanent loss of vision in the eyes of the claimant; that his vision was better than normal at the time of the hearing; and that he continued to work after the injury until the work on the "Ramsey Tower" was completed.

It is admitted that there is no scale for the measurement of what is termed "visual efficiency." What is normal "visual efficiency"? The record is silent. In the absence of a scale by which "visual efficiency" may be measured and in the absence of testimony that the witness knew what constituted normal "visual efficiency," the testimony of the witness shows at best only conjecture. However, it is not necessary for us to consider that feature of the case, for, while the Workmen's Compensation Act should be liberally construed, we do not feel justified in extending its scope to include a thing which evidently was not contemplated by the act and which would cause endless trouble in the application of the act. If an award may be made for a loss of "visual efficiency" when there is no loss of vision and an award may be made for a loss of vision, then we would have two awards based on loss of use of the eye. We do not think that the act contemplates such double liability. If the act contemplates but one liability, in every case of loss

of vision we would be required to first ascertain how much, if any, loss of "visual efficiency" had been sustained prior to the injury.

We find nothing in Winona Oil Co. v. Smithson, 87 Okla. 226, 209 P. 398, United States Gypsum Co. v. McMichael, 146 Okla. 774, 293 P. 773, or the other cases relied upon by the claimant to support his contention.

The correct rule is stated in Prairie Pipe Line Co. v. Dodd, 146 Okla. 140, 293 P. 1104, as follows:

"It is the duty of this court to review the evidence only for the purpose of determining whether or not there is any competent evidence tending to support the award of the Commission, and if there is no evidence tending to support the award, the judgment must be set aside."

Under that rule, the award of the State Industrial Commission must be vacated.

The award of the State Industrial Commission is vacated.

LESTER, C. J., and RILEY, HEFNER, CULLISON, SWINDALL, McNEILL, and KORNEGAY, JJ., concur. CLARK, V. C. J., absent.